NORTHWEST ENVIRONMENTAL DEFENSE CENTER, Citizens for Public Accountability, and West Eugene Wetlands Friends, Plaintiffs,

v.

Timothy WOOD, District Engineer for the Portland District of the United States Army Corps of Engineers, Togo D. West, Jr., Secretary of the Army, and United States Army Corps of Engineers, a department of the United States Army, Defendants,

and

Hyundai Electronics of America and City of Eugene, Intervenors.

No. 95–1994–HO.

United States District Court, D. Oregon.

March 5, 1996.

Gary Keith Kahn, Peggy Hennessy, Reeves Kahn & Eder, Portland, OR, for plaintiffs.

James L. Sutherland, Assistant U.S. Attorney, Eugene, OR, Steven E. Rusak, U.S. Dept. of Justice, Environment & Natural Resources, Washington, DC, Lois J. Schiffer, Stephanie M. Parent, U.S. Dept. of Justice, Environment & Natural Resources Division, Washington, DC, John A. Sheehan, Environmental Defense Section, Dept. of Justice, Washington, DC, for defendants.

Glenn Klein, Harrang Long Gary Rudnick, Eugene, OR, for City of Eugene.

Robert H. Fraser, Luvaas Cobb Richards & Fraser, Eugene, OR, Richard S. Gleason, Per A. Ramfjord, Stoel Rives, Portland, OR, for Hyundai Electronics of America Inc.

## ORDER

HOGAN, Chief Judge.

Plaintiffs bring this action challenging the Army Corps of Engineers' decision to issue a permit allowing Hyundai Electronics of America to fill 10.4 acres of wetlands to accommodate a semiconductor fabrication plant in Eugene, Oregon. Plaintiffs argue that the issuance of the permit violates the Clean Water Act, 33 U.S.C. § 1344, and that the Army Corps of Engineers' decision not to prepare an Environmental Impact Statement with regard to the issuance of the permit violates the National Environmental Policy Act, 42 U.S.C. § 4321, et seq. Plaintiffs seek a preliminary injunction against the filling of the subject wetlands or, alternatively, a permanent injunction pending compliance with applicable laws and regulations (# 15). Defendants and defendant-intervenor Hyundai have filed cross-motions for summary judgment (# 30, # 32) as well as a motion to limit review to the administrative record (# 29).

## FACTS

Hyundai Electronics of America (Hyundai) entered into a contract with D.A.G. Trusts Partnership (DAG) to purchase a 205–acre parcel of land located in the Willow Creek Industrial Park in west Eugene. The Willow Creek site contains approximately 63.6 acres of wetlands. It is zoned for special light industrial use in the Eugene–Springfield Metropolitan General Plan. The site is within the area governed by the West Eugene Wetlands Plan (WEWP) but is not specifical-

ly addressed in the WEWP. The site is scheduled for inclusion in the WEWP by July 31, 1996. AR, vol. 1 at 22–23.[1]

The Hyundai/DAG contract is contingent on DAG obtaining necessary permits, including a wetlands fill permit as required under the Clean Water Act (CWA). DAG submitted its initial application for such a permit to the Portland district of the United States Army Corps of Engineers (the Corps) on June 5, 1995, seeking approval to fill 34.7 of the 63.6 acres of wetlands.

The initial permit application sought to develop the semiconductor facility in three phases. Phase I consisted of a clean room manufacturing area, office space, central utilities, interior chemical storage and distribution, exterior bulk liquid gas storage, and parking. Phase II included facilities similar to those in phase I. Phase III would probably include facilities similar to phases I and II and would probably be comparable in size to phases I and II combined. AR, vol. 1 at 21.

The Corps solicited public comment through issuance of public notice on June 30, 1995. AR, vol. 1 at 52. The comment period was initially scheduled to end July 25, 1995, but was extended to September 5, 1995. Public hearings were held August 16, 1995, and August 24, 1995. Colonel Timothy L. Wood, district engineer for the Corps, indicated at the August 24 hearing that "[a]dditional information will be considered in the evaluation process up until the final decision is made." AR, vol. 9 at 4296. During the process, the Corps received over 1200 letters as well as testimony from approximately 200 individuals. AR, vol. 1 at 50. A substantial amount of information, from both Hyundai and the public, was received after the official close of the public comment period. As all project changes subsequent to the close of the public comment period resulted in "reductions to wetland fills or potential impacts," the Corps determined that "reinitiati[on] [of] the public review process ... is not required." AR, vol. 1 at 52.

On December 20, 1995, the Corps issued wetlands fill permit number 95–00482, signed by Colonel Wood. In the decision document allowing the permit, the Corps determined that the project purpose was to construct "a large semiconductor facility in the Eugene area." AR, vol. 1 at 21. The Corps also found that

> while the project is not water-dependent and includes the placement of fill in ... wetlands, it has been clearly demonstrated that there are no available, practicable alternatives having less adverse impact on the aquatic ecosystem and without other significant adverse environmental consequences that do not involve discharges into "waters of the United States" or at other locations within these waters.

AR, vol. 1 at 62.

Finally, the Corps found that issuance of the permit was not contrary to the public interest and would not have a significant impact on the human environment, especially given the limitations and conditions imposed by the permit. AR, vol. 1 at 63–63; 65–70.

The permit limited and conditioned the project in certain respects. It was issued only after Hyundai withdrew the phase III proposal and, thus, only authorized the first two phases. AR, vol. 1 at 22. The amount of wetlands to be filled was accordingly reduced from 34.7 to 10.4 acres. In addition, the permit required Hyundai to restore 13 acres of wetlands and enhance 6.9 acres of wet prairie lands. AR, vol. 1 at 29. The permit included 46 general and special conditions. AR, vol. 1 at 65–70.

## DISCUSSION

### I. Standards of Review

■ The Corps' decisions to issue the wetlands fill permit and to forego an Environmental Impact Statement are subject to an arbitrary and capricious standard of review under the Administrative Procedure Act, 5 U.S.C. § 706. *See also Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 373–74, 109 S.Ct. 1851, 1859, 104 L.Ed.2d 377 (1989) (arbitrary and capricious standard applies to agency findings which involve agency expertise). Under this standard, an agency

---

1. "AR" references are to the Administrative Record as consecutively paginated.

decision must be upheld unless it is "arbi-. trary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). Although "inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). The agency's action may not be set aside so long as it has a "rational basis." *Bowman Transp., Inc. v. Arkansas–Best Freight System, Inc.,* 419 U.S. 281, 290, 95 S.Ct. 438, 444, 42 L.Ed.2d 447 (1974); *Friends of the Earth v. Hintz,* 800 F.2d 822, 831 (9th Cir.1986).

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). The moving party must carry the initial burden of proof by identifying portions of the record which demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). In assessing whether a party has met this burden, the court must view the evidence and the inferences drawn from that evidence in the light most favorable to the non-moving party. *Bell v. Cameron Meadows Land Co.,* 669 F.2d 1278, 1284 (9th Cir.1982).

If the moving party meets its burden, the burden shifts to the opposing party to present specific facts showing there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The non-moving party cannot rely solely on facts alleged in their pleadings to avoid summary judgment. *T.W. Elec. Serv. v. Pacific Elec. Contrs.,* 809 F.2d 626, 630 (9th Cir.1987). Instead, their response, by affidavit or otherwise, must set forth specific facts showing there is a genuine issue for trial. *T.W. Elec.,* 809 F.2d at 630.

## II. Motion to Limit Review to Administrative Record

■ Generally, review of agency decisions is limited to the administrative record as it existed when the agency rendered its decision. *Friends of the Earth v. Hintz,* 800 F.2d 822, 828–29 (9th Cir.1986). However, other evidence may be presented for the limited purposes of determining whether the agency has considered relevant factors or adequately explained its decision. *Greenpeace Action v. Franklin,* 14 F.3d 1324, 1334, n. 12 (9th Cir.1992).

Plaintiffs have submitted several expert declarations in an attempt to show that the Corps failed to consider relevant factors or explain its decision in light of the alleged controversy and uncertainty surrounding the issuance of the permit. The court has considered these declarations, but only to the extent they are relevant to whether the Corps considered relevant factors or adequately explained its decision.

## III. Summary Judgment Motions

### A. Clean Water Act

#### 1. Practicable Alternatives Test

The Corps may not issue a wetlands fill permit without complying with the guidelines promulgated under section 404(b)(1) of the Clean Water Act. 33 C.F.R. § 320.4(a)(1). One such guideline requires the Corps to apply a "practicable alternatives" test, under which the Corps must deny a fill permit

> if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences.

40 C.F.R. § 230.10(a).

When the proposed project is not water dependent, the guidelines place the burden on the applicant to "clearly demonstrate[ ]" that there are no practicable, less damaging sites. 40 C.F.R. § 230.10(a)(3). The regulations define "practicable" to mean "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of the overall project purpose." 40 C.F.R. § 230.10(a)(2); 230.3(q).

The regulations contemplate a certain degree of flexibility in an agency's application of the practicable alternatives test under cer-

tain circumstances. The preamble to 40 C.F.R. § 230.10 provides:

> Although all requirements in § 230.10 must be met, the compliance evaluation procedures will vary to reflect the seriousness of the potential for adverse impacts on the aquatic ecosystems posed by the specific ... activities.

In addition, the guidelines require the Corps to consider planning processes relevant to a proposed site:

> To the extent that practicable alternatives have been identified and evaluated under a ... planning process, such evaluation shall be considered ... as part of the consideration of alternatives under the Guidelines.

40 C.F.R. § 230.10(a)(5).

### a. Project Purpose

In order to conduct a practicable alternatives test, the Corps must first determine the "overall project purposes." 40 C.F.R. § 230.10(a)(2). While the Corps may not manipulate the project purpose so as to exclude alternative sites, "the Corps has a duty to take into account the objectives of the applicant's project." *Sylvester v. United States Army Corps of Eng'rs*, 882 F.2d 407, 409 (9th Cir.1989).

Plaintiffs contend the Corps erred in its application of the practicable alternatives test by defining the project purpose too narrowly. The Corps determined that Hyundai's project purpose was to "develop a large semiconductor fabrication plant in the Eugene area." AR, vol. 1 at 21. Plaintiffs contend that because Hyundai is a multinational company with national and international customer bases, there was no need to restrict the project purpose to Eugene; rather, the scope of alternate sites should have been national, or at least state-wide. Plaintiffs argue that Hyundai failed to clearly demonstrate that the project purpose should be restricted to the Eugene area.

■ The administrative record contains detailed explanations for Hyundai's desire to build its plant in the Eugene area. These include proximity to customers, suppliers, and competitors; availability of quality, trainable labor; proximity to a major univer-

sity; access to adequate transportation facilities; availability of sufficiently large sites in an urban area with adequate utilities, proper zoning and other conditions appropriate for semiconductor manufacturing; land-use planning and regulatory support in the community; and the availability of financial and tax incentives. AR, vol. 4 at 1346 to 1356. The decision document states that the Corps "reviewed and evaluated ... the documents and factors concerning this permit application." AR, vol. 1 at 62. In light of the substantial evidence in the record regarding Hyundai's legitimate economic reasons for choosing to construct its project in Eugene, the Corps' decision to restrict the project purpose to "the Eugene area" was neither arbitrary nor capricious.

### b. Practicability of Alternatives

■ After determining the project purpose, the Corps must consider alternatives that are "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of the overall project purpose." 40 C.F.R. § 230.10(a)(2). As noted above, the overall project purpose here was to "develop a large semiconductor fabrication plant in the Eugene area." Under the regulations, Hyundai had the burden to show by clear and convincing evidence that, given cost, technology, and logistical factors, its overall project purpose could not be achieved on an alternative site with less damage to the aquatic ecosystem.

Hyundai considered seven sites within the Eugene area's "Special Light Industrial" zoning designation: the Pierce site in Springfield (68 acres); the Gateway site in Springfield (200 acres); the Coburg–Crescent site in northeast Eugene (120 acres); the West Park site in west Eugene (127 acres); the Spectra–Physics site in west Eugene (122 acres); the Greenhill Technology Park in west Eugene (198 acres); and the Willow Creek site (240 acres). AR, vol. 4 at 1357, 1609. Hyundai's consultants stated that the first four sites did not meet Hyundai's size needs. *Id.* at 1357–58. Moreover, the Pierce site was located near a railway which would cause vibration that would interfere with the semiconductor fabrication process. AR, vol.

4 at 1609. In addition, 80 of the Spectra–Physics site's 122 acres had been designated for protection under the WEWP. AR, vol. 4 at 1358. Finally, Hyundai determined that the Greenhill site contained more valuable wetlands, would require more wetland-acres to be filled, would be more prone to vibration (requiring $6 million in the construction of isolation tables), and would be less aesthetically pleasing than the Willow Creek site. AR, vol. 4 at 1358 to 1368.

Hyundai also submitted information regarding the Enid Road site, a site plaintiffs maintain is a practicable alternative. AR, vol. 2 at 808. Hyundai submitted information that (1) there were three separate parcels owned by different parties, complicating the acquisition process; (2) the area is served by two electrical utilities suppliers, neither of which have the capacity to adequately serve Hyundai's project; (3) the site is subject to harmful electrical interference; (4) heavy industry zoning allows uses such as railroad lines that could cause harmful vibrations; (5) the site is between railroad lines; (6) the site does not have adequate sanitary sewers or water supply; and (7) part of the site contains wetlands, and an existing storm water ditch would require relocation. AR, vol. 2 at 807–08. In addition, there is evidence in the record that rezoning other sites in the Eugene area would not be practicable. AR, vol. 1 at 346; AR, vol. 7 at 3206–13.

In its decision, the Corps' reviewing officer does not reiterate or specifically analyze all the information submitted by Hyundai regarding the practicability of alternative sites in the Eugene area. However, he does state:

> I have reviewed and evaluated, in light of the overall public interest, the documents and factors concerning this permit application.... In doing so, I have considered the possible consequences of the proposed activities ... with regard to compliance with the 404(b)(1) Guidelines....

AR, vol. 1 at 62.

In addition, the reviewing officer was involved with soliciting information from Hyundai regarding practicable alternative sites, stating on one occasion:

> I want to further emphasize the importance of your alternatives analysis in our

evaluation of this application, and in our decision regarding this permit.

AR, vol. 5 at 2048.

The Corps concluded that "it has been clearly demonstrated that there are no available, practicable alternatives having less adverse impact on the aquatic ecosystem and without other significant adverse environmental consequences...." AR, vol. 1 at 62. It is apparent that this conclusion was based in part on the substantial evidence submitted by Hyundai with regard to practicable, alternative sites. See SEC v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947) (basis for administrative decision "must be set forth with such clarity as to be understandable").

■ While the Corps rested its decision in part on Hyundai's submitted alternatives analysis, it is apparent that the Corps' decision was also based in significant part on the fact that the WEWP had already been approved under a section 404(b)(1) practicable alternatives analysis and that the Hyundai project would be designated for development under the WEWP by July 31, 1996. In their November 17, 1994 decision approving the WEWP, the Corps anticipated a less stringent application of the alternatives analysis with regard to development projects on wetlands within the WEWP area that meet the WEWP's criteria for development. AR, vol. 1 at 24. In accord with this anticipated, albeit not yet implemented, procedure for permitting projects within WEWP development criteria, the Corps relied on its prior acknowledgement of the WEWP as the least damaging practicable alternative "to managing future [light industrial] development," id. at 25, in finding the Willow Creek site to be the least damaging practicable alternative for Hyundai's project. See id. at 26.

■ The Corps' consideration of its prior acknowledgement of WEWP as the least damaging practicable alternative for managing industrial development in the campus/light industrial sector is consistent with the 404(b)(1) guidelines. A reasonable interpretation of 40 C.F.R. § 230.10(a)(5) is that such an analysis is appropriate where the proposed development complies with a land

use law that the Corps and EPA have already determined to be the least damaging practicable alternative for accommodating such projects. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984) (requiring judicial deference to agency's reasonable interpretation of ambiguous statute). Moreover, such an approach strikes a reasonable balance between the national interest in administering the Clean Water Act and Eugene's interest in administering its land use laws.[2]

Section 230.10 also allows a more flexible procedural approach with respect to projects that the Corps deems to be less serious threats to wetlands. The Corps promulgates nation-wide permits for activities having "minimal impacts" on the waters of the United States. 33 C.F.R. § 330.1(b). One such permit is available for activities which fill no more than ten acres of wetlands. 33 C.F.R. Pt. 330, App. A ¶ 26. Where the activity displaces less than ten but more than one acre of water, the permittee must notify the Corps but may proceed with the project after 30 days unless otherwise notified by the Corps. 33 C.F.R. § 330.1(e).

■ While there are factors and concerns that point to this project's impact on the subject wetlands, the Corps' nationwide permit regulations, promulgated with the benefit of rulemaking procedures and agency expertise, suggest that any wetlands impact resulting from the fill of 10.4 acres is likely to be at the low end of the spectrum. Under 40 C.F.R. § 230.10, the proposed fill of 10.4 acres is close enough to what the Corps considers to be a "minimal" impact to warrant a more procedurally flexible alternatives review procedure. This authorized flexibility supports the court's conclusion that the Corps did not abuse its discretion by basing its decision in part on the project's conformance with the WEWP.

**2.** Plaintiffs argue that consideration of the WEWP permit analysis was not appropriate because the Willow Creek site, though scheduled for inclusion in a July, 1996 amendment to the WEWP, is not currently addressed in the WEWP. This distinction is not material as 40 C.F.R.

**c.  Obligation to Reinitiate Alternatives Analysis After Elimination of Phase III**

Plaintiffs submit that the Corps was obligated to require an additional alternatives analysis after the Corps "deleted Phase III from consideration." Plaintiffs' Reply Brief (# 37) at 11. Plaintiffs' position is that phases I and II require less land and that sites that could not practicably accommodate all three phases could accommodate the first two.

As indicated above, Hyundai had the burden of showing clearly that there were no less damaging, practicable alternatives for achieving its overall project purpose. In order to meet this burden, Hyundai submitted substantial information supporting its contention that no other sites in the Eugene area could practicably accommodate a "large semiconductor facility" without more damage to the aquatic ecosystem than the Willow Creek site. Although the analysis of alternative sites in the Eugene area may have been premised to some extent on "Hyundai's needs of 200 acres," AR, vol. 4 at 1609, the Corps' decision was ultimately based on the determination that no alternative sites could practicably accommodate Hyundai's overall project purpose. 40 C.F.R. § 230.10; AR, vol. 1 at 62.

■ As defendants stated at oral argument, complex development plans such as Hyundai's are necessarily subject to modification. Unless a modification substantially alters the overall project purpose, the Corps should not be required to reinitiate an alternatives analysis. Furthermore, the need to reinitiate an alternatives analysis is diminished where project modifications have lowered the potential for adverse environmental impact, where that impact is close to what Corps regulations deem "minimal," and where the proposed project is determined to be in compliance with applicable local land use laws. In light of these factors, the Corps did not act arbitrarily or capriciously by not

§ 230.10(a)(5) merely requires the Corps to consider the WEWP "as part of the consideration of alternatives under the Guidelines." Plaintiffs have cited no authority which would preclude the Corps from considering the project's conformance with the WEWP.

requiring a new alternatives analysis after the elimination of phase III from consideration.[3]

■ In sum, there is substantial evidence in the record that the Corps thoroughly considered the alternative sites analysis submitted by Hyundai in addition to the Corps' own prior analysis regarding WEWP alternatives. Given the substantial information in the record, it was not arbitrary or capricious for the Corps to conclude that "it has been clearly demonstrated that there are no available, practicable alternatives having less adverse impact on the aquatic ecosystem and without other significant adverse environmental consequences that do not involve discharges into 'waters of the United States' or at other locations within these waters." AR, vol. 1 at 62.

### 2. Public Interest Analysis

The Corps' general regulatory procedures require permit decisions to "be based on an evaluation of the probable impacts, including cumulative impacts, of the proposed activity ... on the public interest." 33 C.F.R. § 320.4(a). This public interest evaluation requires a "general balancing" of the project's benefits and detriments, taking into account (1) "the public and private need" for the project; (2) "the practicability of using reasonable alternative locations and methods"; and (3) the extent and permanence of the beneficial and/or detrimental effects...." 33 C.F.R. § 320.4(a)(2)(i)–(iii).

Plaintiffs contend that "[a]ny public or private need for the proposed chip plant is outweighed by the public interest in protecting the wetland resource on the site." Memorandum in Support of Motion for Preliminary Injunction or Summary Judgment (# 16) at 13. The Corps, of course, did not reach this conclusion, finding issuance of the permit to be

> based on thorough analysis and evaluation of the various factors affecting the public interest; that there are no reasonable alternatives available to the applicant that will achieve the purposes for which the

work is being constructed; that the proposed work is not contrary to the public interest as reflected in the comments of Federal, State and local agencies and the general public; that the proposed work is deemed to comply with established State and local laws, regulations and codes; that the issuance of this permit is consonant with national policy, statutes, and administrative directives; and that on balance the activity is not contrary to the public interest. . . .

AR, vol. 1 at 64.

Moreover, the decision document explicitly addresses alternative sites (as described above); the minimization of wetland impacts through the elimination of phase III and the modification of the stockpiling plan; the effects on water, soil, and drainage; the effects on wildlife (including endangered and threatened species) and other biological characteristics; the effects on "human use characteristics" such as recreation, aesthetics, transportation, general safety, air quality, noise levels, cultural sites, economics, and adjacent private property owners; secondary and cumulative effects, including the prospective development of phase III; the comments of agencies, including the Fish and Wildlife Service, the Environmental Protection Agency, the Oregon Division of State Lands, the Oregon Department of Environmental Quality, the Oregon Department of Fish and Wildlife, the Oregon Department of Transportation; and the comments of the public, including the Nature Conservancy and individuals who provided input via the 1200 comment letters and 200 public hearing testimonials. AR, vol. 1 at 20–62.

■ The Corps' decision that issuance of the permit was in the public interest was based on a careful balancing of relevant public concerns and thousands of pages of public and agency input. Though it may have differed from plaintiffs' opinion, the Corps' decision that issuance of the permit was in the public interest was not arbitrary or capricious or in violation of applicable law.

---

**3.** If Hyundai does choose to pursue phase III, it will be required to obtain an additional permit for the fill of additional wetlands under section

404(b)(1) of the Clean Water Act. This will require a new alternatives analysis specific to phase III.

### 3. Meaningful Public Comment

The regulations require the Corps to provide the public with an opportunity for "meaningful comment." 33 C.F.R. § 325.3(a). Plaintiffs allege the Corps deprived the public of this opportunity by accepting and considering certain information submitted by Hyundai after the official close of the public comment period. This information, plaintiffs contend, was crucial in that it set forth Hyundai's practicable alternatives analysis and proposed mitigation plan.

The public had ample opportunity for meaningful comment prior to September 5, 1995. The Corps provided an initial comment period from June 30, 1995 to July 25, 1995. The Corps held public hearings on August 20 and 26, 1995, and granted an additional comment period from August 26 to September 5, 1995 for the submission of written comments into the hearing record. Although several citizens asked the Corps to extend the comment period an additional 30 days (AR, vol. 10 at 4969, 4978, 5003, and 5004 and vol. 11 at 5512), the Corps declined to do so. Ex. B to Plaintiffs' Reply Brief (# 37). Nonetheless, the Corps stated at the public hearing that it would accept and consider public comment up to the time of the decision. AR, vol. 9 at 4296.

Despite these arguably mixed signals regarding the official close of the public comment period, the Corps received many written comments after September 5. Many of these comments concerned issues addressed in the materials submitted by Hyundai after September 5. For example, many written comments addressed the alternative sites and project purpose issues. *See, e.g.,* AR, vol. 10 at 4830, 4927, 4929, 4945, 4968, 4972, 4995–96, 4994, 4998, and 5006. Others addressed wetlands mitigation issues. *See, e.g.,* AR, vol. 10 at 4928, 4931, 4978, 4979, 4980, 4996–97, 5006, and 5027. And many comments reflected on the need for public input. *See, e.g.,* AR, vol. 10 at 4810, 4846, 4927, 4934, 4974, 4975, 4976, 4979, 4992, 4993, 5003, and 5004. Moreover, the Corps explicitly responded to these public concerns in the decision document, *see* AR, vol. 1 at 50–62, stating that "[a]ll comments on this action received prior to the date of this document have been reviewed and considered in arriving at the decision addressed in this document." AR, vol. 1 at 62.

■■■■■ It is appropriate to note that the permit decision process at issue here is not an official rulemaking procedure subject to the stricter notice and comment procedures under 5 U.S.C. § 553. *Compare Idaho Farm Bureau Fed'n v. Babbitt,* 58 F.3d 1392, 1404–05 (9th Cir.1995); *Rybachek v. United States EPA,* 904 F.2d 1276, 1286 (9th Cir. 1990); *BASF Wyandotte Corp. v. Costle,* 598 F.2d 637, 644–45 (1st Cir.1979) (noting that it is "perfectly predictable" that an administrative agency will collect new data during the comment period "in a continuing effort to give the regulations a more accurate foundation" and stating that "[t]he agency should be encouraged to use such information in its final calculations without thereby risking the requirement of a new comment period"), *cert. denied,* 444 U.S. 1096, 100 S.Ct. 1063, 62 L.Ed.2d 784 (1980). Rather, the Corps' purpose here was to determine whether Hyundai's permit application met relevant legal standards under the Clean Water Act, the National Environmental Policy Act, the West Eugene Wetlands Plan, the Endangered Species Act, and other state and federal laws and regulations. Public input was certainly important and helpful in enabling the Corps to fairly determine the permit application's conformance with these existing legal standards. However, the opportunity to more thoroughly promote the public interest presented itself during the promulgation, rather than the application, of these legal standards. Thus, while the Corps' decision may not have been conducted along the lines of an informal rulemaking procedure, its procedures provided the public with ample opportunity for "meaningful comment."

### B. The National Environmental Policy Act

#### 1. FONSI

The National Environmental Policy Act (NEPA) requires an agency to determine whether a proposed major federal action is likely to have a "significant" effect on all the human environment. 42 U.S.C.

§ 4332(2)(C).[4] If the agency determines the proposed action is likely to have a significant effect on the human environment, it must prepare a comprehensive Environmental Impact Statement (EIS) regarding the proposed action. If, on the other hand, the agency determines the proposed action is not likely to have a significant effect, the agency need only issue a Finding of No Significant Impact (FONSI). In this case, the Corps issued a FONSI with regard to the issuance of the wetlands fill permit, and plaintiffs challenge this decision as arbitrary and capricious.

■■■■ Whether an effect is "significant" is determined by considering the "intensity" and "context" of all the proposed action. 40 C.F.R. § 1508.27. Regulations provide that an agency "should" consider the following factors, among others, in determining the "intensity" of a proposed action:

(3) Unique characteristics of the geographic area such as proximity to . . . wetlands. . . .

(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(5) the degree to which the possible effect on the human environment are highly uncertain or involve unique or unknown risks.

    \*    \*    \*    \*    \*    \*

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

    \*    \*    \*    \*    \*    \*

(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

40 C.F.R. §§ 1508.27(b)(3), (4), (5), (7), and (9).

In the Ninth Circuit, an agency's FONSI must be upheld if the agency has taken a " 'hard look' at the environmental consequences and has based its finding on a 'reasoned evaluation of the relevant factors.' " *Greenpeace Action v. Franklin,* 14 F.3d 1324, 1332 (9th Cir.1992) (quoting *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 373–74, 109 S.Ct. 1851, 1859, 104 L.Ed.2d 377 (1989). Moreover, it is proper for the Corps to consider the degree to which compensatory mitigation requirements are likely to offset otherwise adverse effects. *Friends of Payette v. Horseshoe Bend Hydroelectric,* 988 F.2d 989, 993 (9th Cir.1993); *see also Friends of Endangered Species, Inc. v. Jantzen,* 760 F.2d 976, 987 (9th Cir.1985) (mitigation "need not completely compensate for adverse environmental effects" in order to justify a FONSI).

The administrative record is replete with information bearing on the impact of the proposed project on Willow Creek wetlands. The Corps addressed wetlands-related concerns expressed by the Fish and Wildlife Service, AR, vol. 1 at 24–25; the Environmental Protection Agency, AR, vol. 1 at 27; the Nature Conservancy, AR, vol. 1 at 48–49; and private citizens, AR, vol. 1 at 53–55 and vol. 10 at 4928, 4930–31, 4973, 4980, 4996–98, 5013, 5019, and 5027–28. The Corps' thorough consideration of the project's impact on wetlands is reflected, among other places, in its findings regarding "Special Aquatic Sites":

> The Wetland Evaluation Technique was used to analyze the wetland functions and values. Additional studies were used to refine the results of the original analysis.

> The wetlands are predominately precipitation driven, the result of a highly impermeable clay layer near the surface which creates seasonal ponding. The presence of the clay layer inhibits deep groundwater recharge, but some groundwater discharges occurs [sic] in the form of springs and seeps. . . . In general, adverse impacts to flood flow alteration, sediment stabilization, and sediment/toxic retention will

---

**4.** The parties do not dispute that the issuance of the permit is a "major federal action." The dispute here focuses on the "significance" of the action.

be offset by the stormwater management plan and on-site wetland mitigation.

The project will impact 10.4 acres of wetland and require the relocation of 2,050 feet of drainage. The drainage will be replaced with 3,400 feet of new stream channel. The new channel will be routed along the northern edge of the mitigation site. As mitigation for the unavoidable wetland impacts, the applicant will restore 13 acres and enhance 6.9 acres of wet prairie wetland. In addition to the wetland mitigation, the 1.4 acre stock pond will be enhanced to increase its habitat value, and a 25 foot wide vegetated buffer will be planted alont Willow Creek Road at the eastern boundary of this site.

AR, vol. 1 at 10.

Plaintiffs have submitted several expert declarations in support of their contention that the Corps acted arbitrarily and capriciously by ignoring certain shortcomings in Hyundai's proposed mitigation plan and by failing to assess certain potential impacts on Willow Creek wetlands and aquatic habitat. Mary H. O'Brien is a botanist and staff scientist for the Environmental Research Foundation and Hells Canyon Preservation Council. Declaration of Mary H. O'Brien (# 18) at 1-2. Dr. O'Brien's declarations, in summary, assert that the Corps did not adequately assess:

(a) ... interactions of multiple toxics;

(b) [i]nteraction of toxic chemicals with acids; and

(c) toxic, acid, and cumulative impacts on wetlands-specific wildlife, plants (other than *Lomatiium bradshawii*), and interspecies relationships likely to be present in the Willow Creek Wetlands and Willow Creek Natural Area wetlands.

Response of Mary H. O'Brien to HEA's Memorandum in Opposition to Wood Plaintiffs' Motion for Preliminary Injunction or Summary Judgment (# 39) at 10.

Plaintiffs have also submitted declarations of Thomas Pringle. Mr. Pringle, owner of Emerald Wetland Consulting, declares that the Corps inadequately assessed the following:

(a) the possibility that Hyundai will not permit prescribed burning or that prescribed burning will otherwise be unfeasible or ineffective;

(b) the possibility that the use of heavy equipment will result in soil compaction;

(c) the project's effect on stormwater runoff and groundwater diversion; and

(d) the project's effect on rare plants, including *Lomatium bradshawii*.

Supplemental Declaration of Thomas Pringle (# 40); *see also* Declaration of Thomas Pringle (# 27).

Professor John Corliss is a member of the Soil Science Society and an Assistant Professor of Soils at Oregon State University. Declaration of John Corliss (# 19) at 1-4. In general, Professor Corliss's concerns relate to the alleged inadequacy of the proposed method for long term collection of hydrological data. More specifically, Professor Corliss contests the adequacy of the DRAINMOD system[5] used for collecting and characterizing water source and flow data. Supplemental Declaration of John Corliss (# 44).

Finally, Professor Paul C. Engelking is a Professor of Chemistry at the University of Oregon. Professor Engelking, in general, challenges the scientific methodology of the Corps' analysis of the effects of acid deposits on plant surfaces. Supplemental Declaration of Paul C. Engelking (# 42).

---

5. DRAINMOD is described in the proposed mitigation plan as follows:

DRAINMOD is a physically-based, continuous simulation model that characterizes the response of a soil/water regime to various combinations of surface and subsurface water management practices. The model conducts a water balance using a time step interval ranging from two minutes ... up to two hours.... The model has been tested on several soil classes and successfully simulates components of the water balance including precipitation, evapotranspiration, surface runoff, infiltration, lateral subsurface drainage, and deep percolation.... DRAINMOD has been adopted by the U.S. Natural Resource Conservation Service in several humid regions of the country and has been used to analyze agricultural drainage practices, subrogation, surface irrigation, and wetland hydrology.

AR, vol. 1 at 108.

██ After carefully reviewing these declarations, the court has no doubt that the disagreements with the Corps' decision are sincerely held and may be scientifically supportable. NEPA, however, does not require an agency FONSI to be beyond scientific reproach. *See Greenpeace Action,* 14 F.3d at 1335. Rather, an agency's FONSI must be upheld so long as it was "carefully considered [and] based on evidence from scientific studies." *Id.* Scientists can, after all, disagree.

██ The Corps' analysis meets this standard. While the Corps may not have satisfied Dr. O'Brien by analyzing the effect of every possible combination of chemicals, the Corps did consider studies submitted by Hyundai's environmental consultants which indicated that it was "unlikely" that air pollutants would be present at concentrations potentially toxic to plants, AR, vol. 2 at 393; that the likelihood of toxic concentrations of chemicals being introduced into wastewater or stormwater was low, AR, vol. 2 at 392–93; and that the risk of toxic chemicals affecting Lomatium bradshawii was "very low." AR, vol. 2 at 765. And while Mr. Pringle may be disillusioned with the prospects for effective prescribed burns, the possibility of soil compaction, or the potential for adverse effects on rare plants, the Corps addressed these issues through the permit conditions, the proposed mitigation plan, and the studies submitted by Hyundai's environmental consultants. AR, vol. 1 at 68 and 69 (conditions 25, 26, and 45 require light impact construction equipment, prescribed burning, and general care for unfilled wetlands); AR, vol. 2 at 733–765 ("Ecological Risk Assessment for Lomatium Bradshawii at the Willow Creek Natural Area, Eugene, Oregon"). While Professor Corliss may not be satisfied that DRAINMOD is the best method for collecting hydrology data, the record suggests DRAINMOD is a scientifically valid method. *See supra,* note 5. And while Professor Engelking may not agree with the "semi-quantitative" methodology Hyundai's consultants used to predict acid deposition, AR, vol. 2 at 751–52, the court is not the proper forum for resolving disputes over the proper coefficient to represent how tightly an acid particle adheres to a surface, the size of acid droplets as they are emitted from a factory, or the

validity of the von Karmen turbulent boundary layer theory. Supplemental Declaration of Paul C. Engelking (# 42). With due respect to this "disagreement among various scientists as to methodology," the court finds that the Corps took as hard a look at the potential impacts on west Eugene wetlands as a court can expect an agency to take. *See Friends of Endangered Species, Inc. v. Jantzen,* 760 F.2d 976, 985 (9th Cir.1985) (under NEPA, court not required to resolve disagreements among scientists as to methodology).

██ Plaintiffs also contend the Corps should have found the proposed action to be significant in light of the controversy surrounding the project. *See* 40 C.F.R. § 1508.27(b)(4). The term "controversial," for purposes of NEPA, concerns disputes about the "size, nature, or *effect* " of the proposed action rather than disputes about whether the action should be allowed in general. *Foundation for North Am. Wild Sheep v. U.S.D.A.,* 681 F.2d 1172, 1182 (9th Cir. 1982) (emphasis in original). Moreover, the controversy must exist at the time the agency renders its decision: the agency is not responsible for considering controversies which arise after the agency renders its decision. *Greenpeace Action,* 14 F.3d at 1334.

Plaintiffs cite *Wild Sheep, supra,* for the proposition that disagreement among scientific experts mandates preparation of an EIS. *Wild Sheep* involved a challenge to a Forest Service decision not to prepare an EIS before granting a special use permit to reconstruct and use a road in bighorn sheep habitat. After preparing an Environmental Assessment (EA), the Forest Service

received numerous responses from conservationists, biologists and other knowledgeable individuals, all highly critical of the EA, and all disputing the EA's conclusion that reopening Road 2N06 would have no significant effect on the bighorn sheep. Both the California State Department of Natural Resources and the California State Department of Fish and Game responded to the EA, expressing disagreement with the EA's conclusions regarding the likely effect of reopening the Road

2N06. We believe that this is precisely the type of "controversial" action for which an EIS must be prepared.

*Wild Sheep*, 681 F.2d at 1182.

Plaintiffs contend that the scientific criticism of Dr. O'Brien, Mr. Pringle, and Professors Corliss and Engelking, as well as interagency criticism levied by the EPA and Fish and Wildlife Service, created enough controversy to require an EIS.

As noted above, the Corps was not responsible for assessing controversy that arose after its decision to issue the permit. Thus, the declarations described above are not relevant to the issue of whether a controversy existed to a sufficient degree to require an EIS. It is, nonetheless, true that private citizens, both scientists and non-scientists, argued against issuance of the permit. Dr. O'Brien and Mr. Pringle, in particular, sent several letters raising concerns along the lines of those expressed in their post-decision declarations. *See* AR, vol. 10 at 4964 and vol. 11 at 5049 (letters from Dr. O'Brien) and vol. 10 at 4829, 4927, 4929, 4930, and 4979 (letters from Mr. Pringle). As indicated above, the Corps addressed these concerns. Moreover, the Corps ultimately stated that its decision was consistent with the views of "numerous commenters" that "sufficient laws, regulations, codes and programs exist to ensure sufficient environmental protection...." AR, vol. 1 at 53. The Corps concluded, "[a]lthough the project remains controversial in the community, the probability of other than non-significant impacts occurring is extremely low." *Id.* at 21.

Plaintiffs point out that during preliminary stages of the permit consideration, the Fish and Wildlife Service and EPA expressed concerns with the project and at one point opined that an EIS should be prepared. At the time the permit decision was issued, though, the Corps stated that these agencies' concerns were addressed either by the elimination of phase III or by the limitations and conditions placed on the permit. AR, vol. 1 at 44–45. The Corps, therefore, stated its belief that "neither [Fish and Wildlife nor the EPA] oppose issuance of the permit, conditioned in the manner described in this decision document." AR, vol. 1 at 51.

It is evident from the record that the Corps took an extremely close look at the controversy surrounding the effects of this project, devoting ardent consideration to disparate scientific views. Moreover, it does not appear from the record that the Corps' decision to forego an EIS was subject to the same widespread expert criticism at the time of the FONSI as was the FONSI in *Wild Sheep*, a case decided under a less deferential "reasonableness" standard of review rather than the arbitrary and capricious standard now applicable under *Marsh* and *Greenpeace Action.* For these reasons, the Corps' FONSI was not rendered arbitrary and capricious by the existence of disagreement regarding the effects of the proposed project.

■■■■ Plaintiffs allege the Corps acted arbitrarily and capriciously by failing to pay proper heed to the uncertainties involved with the project. NEPA regulations, however, do not require a reviewing agency to eliminate all uncertainty prior to issuing a FONSI. *See Greenpeace Action,* 14 F.3d at 1336 (agency not required to achieve "a degree of certainty that is ultimately illusory"). As discussed above, the Corps was provided detailed studies and took a hard look at the project's potential effects on drainage patterns, water quality, storm buffers, soil, aquatic organisms, endangered and threatened species, aesthetics, transportation, energy consumption, air quality, noise, and local economics. *See* AR, vol. 1 at 27–62. The decision document states "[t]here is a good understanding of the risks and uncertainties associated with this project, and multiple preventive measures are being implemented to make these risks and uncertainties as small as possible." AR, vol. 1 at 40. The Corps did all that NEPA requires in assessing project uncertainties.

Plaintiffs further argue the Corps should have prepared an EIS given the effect of the project on Lomatium bradshawii, a plant species listed as endangered under the Endangered Species Act. The Corps considered extensive studies on the project's foreseeable

effects on the Lomatium bradshawii, including a 35–page study entitled "Ecological Risk Assessment for Lomatium bradshawii at the Willow Creek Natural Area, Eugene, Oregon." AR, vol. 2 at 728–765. This study concluded that the "ecological risk to Lomatium bradshawii ... from exposure to chemicals that will be discharged from Hyundai's proposed facility appear [sic] to be extremely low." AR, vol. 2 at 765.[6]

In addition, on November 1, 1995, the Corps entered formal consultation with Fish and Wildlife under section 7(a) of the Endangered Species Act. On November 29, 1995, Fish and Wildlife issued a biological opinion concluding that the Hyundai project was not likely to jeopardize Lomatium bradshawii. AR, vol. 8 at 3965. Fish and Wildlife's opinion, moreover, was based on the assumption that all areas of high and low quality habitat contained lomatium and that all three phases of the project would be completed. AR, vol. 8 at 3953 and 3961.[7] The Corps gave the requisite hard look to the effect of the proposed project on lomatium, and its conclusion that any such effect would not have a significant effect on the human environment is not arbitrary or capricious.

■ Plaintiffs submit that the Corps acted arbitrarily and capriciously by failing to consider the foreseeable effects of phase III in deciding whether to prepare an EIS. Hyundai points out that a federal district court for the district of New Jersey upheld an agency's FONSI when a developer originally planned to build both office and residential buildings but suspended the residential plans after the agency told him an EIS would be required for both projects. *Nat'l Audubon Soc'y v. Hartz Mt. Development Corp.*, 14 Envtl.L.Rep. 20724, 20729, 1983

WL 20301 (D.N.J.1983). This approach is consistent with Ninth Circuit precedent, under which an agency may separately consider portions of a project that have their own "independent utility." *Thomas v. Peterson*, 753 F.2d 754, 759–60 (9th Cir.1985) (requiring EIS to address cumulative effects of future timber sale in addition to construction of timber sale access road). An initial project phase lacks "independent utility" if it would be "irrational, or at least unwise, to undertake the [initial] phase if subsequent phases were not also undertaken." *Id.* at 759.

Here, the Corps found that phase III was "not essential to accomplishing the project purpose" and that it was uncertain when, whether, and to what extent phase III would be pursued. AR, vol. 1 at 21–22. Based on these findings, it was not arbitrary or capricious for the Corps to consider phase III to be an independent and speculative project and to consider the effect of phases I and II aside from phase III.

### 2. Restriction of Public Comment

■ Plaintiffs claim the Corps violated NEPA by failing to offer sufficient opportunity for public comment during the preparation of its Environmental Assessment. Under NEPA regulations, the Corps is required to involve the public in the preparation of an EA "to the extent practicable." 40 C.F.R. § 1501.4(b). The requirement of public involvement is not as high as that required in the preparation of an EIS. *Town of Rye v. Skinner*, 907 F.2d 23, 24 (2d Cir.1990) (finding public participation in EA adequate despite agency's failure to allow public comment on an independent study commissioned after the close of public comment), *cert. de-*

---

**6.** While the ecological risk assessment studied the effects on Lomatium known to exist in areas neighboring the project site, two earlier studies found no Lomatium existing on the project site itself. Hyundai has agreed to implement conservation measures in the event Lomatium are discovered on-site. AR, vol. 1 at 30–31.

**7.** Plaintiffs correctly point out that while Fish and Wildlife concluded that the project would

pose no jeopardy to the continued existence of lomatium, the Service declined to concur in the Corps' "no effect" determination on the basis that the project included suitable lomatium habitat that had not been adequately surveyed for lomatium. AR, vol. 8 at 3953. Nevertheless, the Service's involvement supports the argument that the Corps took a hard look at the project's effect on the Lomatium bradshawii.

*nied,* 498 U.S. 1024, 111 S.Ct. 673, 112 L.Ed.2d 665 (1991).

As described in more detail above, public comment on the Hyundai project has been voluminous. *See* AR, vol. 9 at 4193–4668 (transcripts of August 16 and 24, 1995 public meetings); vol. 10 at 4739–4776 (public comment letters topic analysis); vol. 10 at 4724–5031, vol. 11 at 5032–5665, and vol. 12 at 5666–6300 (public comment letters). The Corps received over 1200 letters and heard over 200 witnesses testify regarding the pros and cons of the Hyundai project, and the Corps took these public comments into account in rendering its decision. AR, vol. 1 at 50, 62. The Corps did not violate the public comment provisions of NEPA or act arbitrarily or capriciously in its provision for public comment.

## CONCLUSION

After carefully reviewing the administrative record and the Corps' decision, the court finds that the decision to issue wetlands fill permit number 95–00482 was rationally based, in accordance with applicable laws and regulations, and neither arbitrary nor capricious. Accordingly, defendants' (# 30) and defendant-intervenor Hyundai's (# 32) motions for summary judgment are granted. Plaintiffs' motion for preliminary injunction or summary judgment (# 15) is denied. Defendants' (# 30) and defendant-intervenor Hyundai's (# 29) motions to limit review to the administrative record are denied to the extent indicated in this order. This action is dismissed.