AUSTRALIANS FOR ANIMALS,
et al., Plaintiffs,

v.

Donald L. EVANS, et al., Defendants.

No. C–04–0086 SC.

United States District Court,
N.D. California.

Jan. 29, 2004.

Lanny Sinkin, Hilo, HI, David Blatte, Animal Law Associates, Berkeley, CA, for Plaintiff.

Ann D. Navaro, General Litigation Section, U.S. Department of Justice, Environment & Natural Resources Division, Washington, D.C., James A. Coda, Assistant U.S. Attorney, Environment & Natural Resources Unit, San Francisco, CA, for Defendant Donald Evans.

James R. Arnold, San Francisco, CA, for defendant Peter Stein.

### FINAL ORDER DENYING PERMANENT INJUNCTION

CONTI, District Judge.

## I.  INTRODUCTION

Plaintiffs Australians for Animals, et al, seek a permanent injunction to prevent Defendant Peter Stein ("Dr.Stein") from conducting oceanographic research involving the use of under-water sonar. The National Marine Fisheries Service ("NMFS"), a co-Defendant, issued Dr. Stein a permit to perform this type of research (the "Permit"), and the legitimacy of the Permit represents the heart of this dispute. In January 2003, this Court invalidated a similar permit that NMFS had issued for the same research (as well as other activities unrelated to the present litigation), holding that NMFS violated the National Environmental Policy Act (NEPA) in authorizing that permit without undertaking a thorough review of the project's possible environmental impact. In the January 2003 Order, this Court enjoined NMFS from issuing any permit allowing similar research without first completing an Environmental Assessment ("EA"). In response to Dr. Stein's recent application, NMFS conducted an Environmental Assessment ("the Stein EA") and subsequently issued the Permit now in question. Plaintiffs allege that NMFS, in

issuing the Permit and in preparing the Stein EA, violated NEPA, the Administrative Procedure Act (the "APA") and the Marine Mammal Protection Act (the "MMPA"). This Court, after holding an accelerated trial on the merits, finds that Plaintiffs have failed to establish that Defendants acted arbitrarily or capriciously in issuing the Permit. Accordingly, Plaintiffs' motion for a permanent injunction is denied and judgment is entered in favor of Defendants.

## II.  FACTUAL HISTORY

### A.  Prior Litigation

One year ago, these same Plaintiffs challenged several permits that NMFS issued to Dr. Peter Tyack for various research projects, including an experiment essentially identical to that of Dr. Stein which lies at the center of this action.[1] In that case, *Hawaii County Green Party, et al. v. Evans, et al.*, No. C–03–0078–SC, 2003 WL 21033523 (N.D.Cal.2003), Dr. Tyack held multiple permits authorizing him to, *inter alia,* test whale-finding sonar in the Northern Pacific. Dr. Stein developed the sonar technology that was to be tested, and Dr. Tyack was retained as the scientific advisor. NMFS granted those permits to Dr. Tyack pursuant to categorical exclusions under NEPA which allow for scientific permits generally to be issued without having conducted any sort of formal environmental evaluation. *See* NOAA Admin. Order Series 216–6, § 6.03. This Court, however, invalidated some of the permits, finding that the public controversy and potential environmental consequence associated with the proposed research precluded application of the categorical exclusion. *See* Order Granting Permanent Injunction,

---

**1.**  Four out of the five Plaintiffs joined in this litigation were also parties to the earlier action: Australians for Animals, Hawaii Green Party, Stop LFAS Worldwide Network and

Sea Sanctuary, Inc. The fifth Plaintiff, Ocean Defense International, was not a party to the previous litigation.

*Hawaii County Green Party,* No. C–03–0078–SC (N.D.Cal. Jan.24, 2003)(the "2003 Order"); *see also* NOAA Admin. Order Series 216–6, § 5.05c. The 2003 Order enjoined all defendants in that case from continuing activities covered by the invalid permits and required that NMFS prepare an Environmental Assessment prior to granting a permit for similar sonar testing on marine mammals.

### B. The 2004 Permit

On May 15, 2003 Dr. Stein submitted an application to NMFS for a permit to conduct high-frequency sonar testing on gray whales off the California coast. In response to Dr. Stein's permit application and in accordance with the relevant administrative regulations, NMFS prepared a draft EA and on November 5, 2003 published a notice in the Federal Register announcing Dr. Stein's application. *See* 68 Fed.Reg. No. 62563 (Nov. 5, 2003); Administrative Record ("AR"), Tab 3. NMFS also announced that it was holding a public meeting in Silver Springs, MD regarding Dr. Stein's permit application. *See* 68 Fed.Reg. 64865 (Nov. 17, 2003); AR, Tab 5. Five different entities or individuals sent written comments to NMFS, including Mr. Lanny Sinkin, counsel for Plaintiffs in this action. That meeting occurred on November 20, 2003, and on December 23, 2003, NMFS issued their final EA and a Finding of No Significant Impact and then the Permit itself. The Permit authorizes Dr. Stein to:

> conduct research to validate and improve the ability of whale-finder sonar systems to detect marine mammals without adversely affecting them. The permit authorizes [Dr. Stein] to expose gray whales (*Eschrictius robustus* ) to the whale-finder sonar sounds to gather data on the reflectivity of gray whales, determine the probability of detection of gray whales out to one mile, and determine, what, if any, reaction the gray

whales may have to high frequency active sonars designed to detect marine mammals. *See* AR, Tab 10 at p. 1. According to the Permit, the proposed research does not involve "activities that may pose a risk of death or injury to marine mammals." *Id.*

### C. The Environmental Assessment

Pursuant to the 2003 Order, NMFS prepared the Stein EA in response to Dr. Stein's permit application to investigate the possible detrimental effects caused by the whale-finder sonar system. At forty-plus pages in length, the Stein EA discusses the purpose of and need for the proposed research, possible alternatives, the affected environment—including social and economic, physical, and biological concerns—and environmental consequences. The chapter on environmental consequences details the effects of proposed alternatives, a comparison of alternatives, compliance with the Endangered Species Act, mitigation measures, unavoidable adverse effects and cumulative environmental impact. The primary section of the Stein EA ends with a consideration of the significant criteria, which leads NMFS to the conclusion that a more thorough Environmental Impact Statement is not warranted.

Plaintiffs, in attempting to invalidate the Permit, allege violations of NEPA, the MMPA and the APA. The common charge underlying Plaintiffs' various objections to the Stein EA is that the sonar that Dr. Stein developed and the manner in which he employs it produces hazardous effects on the Northern Pacific ecosystem, particularly against California gray whales. On January 8, 2004, Plaintiffs filed a complaint seeking a temporary restraining order and preliminary injunction against Defendants that would halt Dr. Stein's research which was already underway. On January 12, 2004, this Court held a temporary restrain-

ing order hearing, after which we held that Plaintiffs failed to satisfy the requirements for a T.R.O., namely probable success on the merits and a possibility of irreparable harm.

Following the denial of Plaintiffs' motion for a T.R.O., this Court held a permanent injunction hearing on Plaintiffs' claims regarding Defendants' alleged violations of NEPA, the MMPA, and the APA. Although Plaintiffs' motion sought only a preliminary injunction, this Court ordered the trial on the merits to be advanced and consolidated with the preliminary injunction hearing, as authorized under Rule 65(a)(2) of the Federal Rules of Civil Procedure. Given the urgency of the situation, we decided *sua sponte* to convert the preliminary injunction hearing into a consolidated trial on the merits. *See* Fed. R.Civ.P. 65(a)(2). As this Court informed the parties of its intent to consolidate the injunction hearing into an accelerated trial and the parties offered no objection, there is no question that the litigants received fair notice and opportunity to be heard. *See Glacier Park Foundation v. Watt,* 663 F.2d 882, 886 (9th Cir.1981); *see also Carlyn v. City of Akron,* 726 F.2d 287, 288 (6th Cir.1984)(parties could not challenge Rule 65 consolidation after resolution of trial on the merits when judge had informed them of his intent to consolidate at the prior T.R.O. hearing).

### III. *LEGAL STANDARD*

#### A. *National Environmental Policy Act*

▮ The purpose of NEPA, 42 U.S.C. §§ 4321, *et seq.,* is to "ensure that federal agencies are informed of environmental consequences before rendering decisions and that the information is available to the public." *Okanogan Highlands Alliance v. Williams,* 236 F.3d 468, 473 (9th Cir.2000). The legislative intent is to focus the attention of both the government agency and the general public on a proposed action in order to evaluate the likely consequences of a particular proposal and make an informed determination regarding that proposal. *See Marsh v. Oregon Natural Res. Council,* 490 U.S. 360, 371, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). "By so focusing agency attention, NEPA ensures that the agency will not act on incomplete information, only to regret its decision after it is too late to correct." *Id.* NEPA requires that relevant environmental information be publicized and subjected to public scrutiny prior to an agency making a decision. *See* 40 C.F.R. § 1500.1(b). NEPA mandates procedure; the statute does not demand particular results but only prescribes the process by which agency decisions are rendered. *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989); *see also Vermont Yankee Nuclear Power Corp. v. Natural Res. Defense Council, Inc.,* 435 U.S. 519, 558, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). "If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Robertson,* 490 U.S. at 350, 109 S.Ct. 1835. Thus the pertinent question for the Court is not whether we would have arrived at the same decision as that of the agency but merely whether the agency's decision was an informed one. *Vermont Yankee,* 435 U.S. at 558, 98 S.Ct. 1197.

▮ NEPA generally requires federal agencies to prepare an Environmental Impact Statement ("EIS") prior to undertaking major federal action where there is a substantial likelihood of significant environmental degradation. *See Public Citizen v. Department of Transp.,* 316 F.3d 1002, 1021 (9th Cir.2003); *Anderson v. Evans,* 314 F.3d 1006, 1017 (9th Cir.2002); *Tillamook County v. U.S. Army Corps of*

*Eng'rs,* 288 F.3d 1140, 1143 (9th Cir.2002); *Hall v. Norton,* 266 F.3d 969, 972–73 (9th Cir.2001). However, an EIS is not necessary in all cases. *See id.* NEPA demands an EIS when substantial questions exist as to whether a proposed project may have a significant effect on the environment. *Id.* Therefore, where no significant environmental impact is likely, the government agency may prepare an EA instead.[2] 40 C.F.R. § 1508.9(a)(2) (1997). An Environmental Assessment is a document that examines whether significant environmental impacts could result from issuance of the proposed scientific research permit. The purpose of an EA is to aide the agency's determination when no EIS is required. *Id.*

An EA should "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9(a)(1) (1997). While an EA ought to include short discussions of the need for the proposal, practical alternatives and the environmental impacts of both the proposal and such alternatives, "long descriptions or detailed data" are unnecessary. 46 Fed. Reg. 18026 (March 23, 1981). Thus an EA is essentially a "rough-cut, low budget environmental impact statement intended to determine whether environmental effects are significant enough to warrant preparation of an EIS." *Sierra Club v. Espy,* 38 F.3d 792, 802 (5th Cir.1994).

### B. The Marine Mammal Protection Act

The MMPA generally prohibits "takings" of marine mammals, where a "taking" means to "harass, hunt, capture, or kill, or attempt [any of such]." 16 U.S.C. §§ 1372(a); 1362(13). The MMPA, however, carves out an exception allowing for "takings" for the purpose of scientific research, as determined by the Secretary of Commerce who may issue permits accordingly. *See* 16 U.S.C. §§ 1371(a)(1); 1374(c)(3).[3] The process for acquiring a permit pursuant to the MMPA is similar to that of NEPA. Individuals seeking MMPA permits must submit an application to the NMFS, which following a period for public review, determines whether the proposed activity comports with the MMPA guidelines or whether such a determination first requires preparation of an EA or EIS. 15 C.F.R. § 216.33(d).

### C. The Administrative Procedure Act

The Administrative Procedure Act governs judicial review of an agency decision under NEPA and the MMPA. *See* 5 U.S.C. § 706; *Pyramid Lake Paiute Tribe of Indians v. United States Dept. of Navy,* 898 F.2d 1410, 1414 (9th Cir.1990). Agency actions may be properly overturned where they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* at § 706(2)(A); *see also Idaho Sporting Congress v. Thomas,* 137 F.3d 1146, 1149 (9th Cir.1998); *Oregon Natural Res. Council v. Lowe,* 109 F.3d 521, 526 (9th Cir.1997). Therefore, in evaluating the legal sufficiency of the agency's action, the Court is required to apply the "arbitrary and capricious" standard of the APA. This standard is highly deferential, and review of the record is to be "searching and careful" but

---

**2.** The Council on Environmental Quality promulgates regulations to provide guidance in applying NEPA requirements. *See Robertson,* 490 U.S. at 355–56, 109 S.Ct. 1835 (1989).

**3.** In November 2003, Congress amended the MMPA to provide a specific definition of harassment as it relates to scientific research. Under the new amendment, "harassment" includes "any act that injures ... or is likely to disturb ... natural behavioral patterns ...." Pub. 1. no. 108–136, § 319(a) (2003).

"narrow." *Marsh,* 490 U.S. at 378, 109 S.Ct. 1851. District courts are not empowered to substitute their own judgment for that of the government agency. *Wetlands Action Network v. U.S. Army Corps of Eng'rs,* 222 F.3d 1105, 1114 (9th Cir.2000). The reason behind this doctrine lies in the principle that a court should not usurp the role of the agency but rather should determine simply whether the agency took a "hard look" at the evidence before it—that is, whether the agency decision was arbitrary or capricious. *See Center for Biological Diversity v. U.S. Forest Serv.,* 349 F.3d 1157, 1166 (9th Cir.2003).

For decisions involving the particular expertise of the decision-maker, the reviewing court should defer to the "informed discretion of the responsible federal agencies." *Marsh,* 490 U.S. at 377, 109 S.Ct. 1851. As the Supreme Court explained:

> "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Id.* at 378, 109 S.Ct. 1851.

For this reason, courts are not required to balance conflicting expert opinions. *See Friends of Endangered Species, Inc. v. Jantzen,* 760 F.2d 976, 986 (9th Cir.1985). That a plaintiff can dispute an agency's findings does not sufficiently establish that the agency acted arbitrarily or capriciously. *See Greenpeace Action v. Franklin,* 14 F.3d 1324, 1336 (9th Cir.1992). Ultimately, the dispositive question is whether or not the agency made an informed decision.

## IV. *DISCUSSION*

### A. *Compliance with NEPA*

Plaintiffs raised seven claims in their original complaint and voiced one additional objection during the T.R.O. hearing before the Court. The first five of these claims involve specific challenges to conclusions that NMFS made in the Stein EA regarding the possible detrimental effects of Dr. Stein's research on the surrounding environment. Plaintiffs also contest the validity of the Stein EA for its failure to discuss significant unknowns associated with the project. This claim surfaced for the first time at the T.R.O. hearing. Plaintiffs' final two claims allege, respectively, that NMFS produced the Stein EA in bad faith and erred in deciding that the proposed research did not warrant preparation of an EIS. We now consider each of these claims in turn.

### 1. *Auditory Effects of Sonar on Gray Whales*

Plaintiffs allege that Defendants ignored possible harmful effects on gray whales stemming from the animals' ability to hear the sonar. According to Plaintiffs, the Stein EA erroneously asserts that gray whales will not be able to detect the sonar sounds. *See* Pls.' Mem. in Supp. of T.R.O. and Prelim. Inj. ("Pls.' Memo") at p. 6. Their contention is that gray whales will likely modify their behavior in reaction to the sonar or that the sonar is loud enough to possibly harm the whales' hearing capacity. Plaintiffs believe that Defendants acted arbitrarily and capriciously in ignoring evidence of how insonification potentially affects gray whales.

The Stein EA adequately discusses the auditory effects of sonar on gray whales (as well as other marine mammals). *See* Environmental Assessment at p. 24. It explains in detail the hearing range of baleen whales (the classification to which gray whales belong) based on frequency and decibel level and concludes that these whales are more sensitive to lower-frequency sounds. *See id.* Furthermore, Dr. Roger Gentry, director of the NMFS Acoustics Program, testified that the so-

nar, when operated at high frequencies, will be inaudible to gray whales and therefore not alter their normal behavior. Decl. of Roger Gentry in Supp. of Federal Defs.' Opp. to Pls.' Mot. for T.R.O. and Prelim. Inj. ("Gentry Decl."), ¶ 3. Also, with respect to the potential for auditory damage, Dr. Gentry explained, "no sonar could produce a sound at [the pertinent] frequency loud enough to cause even a temporary change in hearing." *Id.* Dr. Gentry compared the effect of the sonar on gray whales to that of a dog whistle on humans and concluded that the Stein EA reasonably and accurately determined that the research posed no risk of acoustic injury to gray whales.

Relying on affidavits and testimony from Mr. Larry Mebust and Ms. Katy Penland, Plaintiffs offer evidence to refute the Stein EA's conclusions and illustrate that gray whales can hear sonar. The majority of this evidence, however, came in the form of anecdotal hearsay regarding the claims of whale-watching boat captains who boasted that they could cause gray whales to breach by activating sonar. Plaintiffs contend that NMFS should have consulted with Mr. Mebust or Ms. Penland in order to thoroughly investigate the behavioral effects of the sonar on gray whales. However, given the lack of scientific expertise of Mr. Mebust and Ms. Penland—a pilot and photographer, respectively—such consultations were not imperative. In addition, even if the Court were to accept the testimony of Mr. Mebust and Ms. Penland as given, Plaintiffs have not offered any explanation as to how the gray whales' mere ability to hear the sonar equates to a harmful effect on the animals.

At the injunction hearing, Plaintiffs' own witness, David Bain, testified under cross-examination to the similarity between the type of sonar employed by Dr. Stein and that of commercial fish-finders. According

to Mr. Bain, Dr. Stein's sonar uses a longer pulse duration, generally lower frequency and has greater depth and range than commercial sonar, but the power source levels between the two are comparable. Furthermore, the frequency range of Dr. Stein's sonar overlaps with that of commercial sonar. Thus there was inconclusive evidence that the sonar involved with the proposed research was substantially different than that which commercial fisherman permissibly use on a regular basis.

### 2. Effects on Cow–Calf Migration

Plaintiffs argue that the Stein EA fails to consider the potential harm that the sonar causes on gray whale migration, specifically regarding cow-calf communication.[4] *See* Pls.' Memo at pp. 18–20. They contend that use of the sonar risks interfering with the ability of cows to communicate with their calves, possibly resulting in calves becoming separated from their mothers and thereby extremely vulnerable. The Stein EA, however, directly addresses the likelihood of communicative interference ("masking"), explaining that masking is improbable given the duration and frequency of the signal. *See* Environmental Assessment at p. 25. On this issue, the Stein EA relies on the opinion of Dr. Tyack, a recognized expert in marine mammal acoustics, and cites three different studies to justify its position. Furthermore, Dr. Gentry testified that the sonar was not likely to compromise cow-calf communications given the frequency of the sonar versus that which gray whales use to communicate. *See* Gentry Decl., ¶ 3. Dr. Gentry analogized the question to humans' ability to converse over the sound of a dog whistle to illustrate the appropriateness of the conclusions reached in the Stein EA.

4. The terms "cow" and "calf" respectively refer to adult female whales and baby whales.

### 3. Gray Whale Population

■ Plaintiffs allege that the Stein EA neglected the precarious state of the gray whale population. Specifically, Plaintiffs challenge the Stein EA's population estimate and question NMFS's failure to list gray whales as an endangered or threatened species. Plaintiffs offer credible testimony through Mr. Bain identifying the forty-percent decline · over the past few years as a sufficiently extraordinary event to merit further investigation, and they contend that the Stein EA improperly disregards the significance of this decline. *See* Pls.' Memo, pp. 11–13. The Stein EA, however, adequately addresses gray whale population, citing multiple studies over the past decade and as recently as 2002 and discussing population trends over the past thirty years. In rebuttal to Mr. Bain, Dr. David J. Rugh confirmed the veracity of the data referenced in the Stein EA and justified the NMFS having removed the Eastern North Pacific stock of gray whales from the endangered species list. *See* Dec. of David Rugh in Supp. of Fed. Defs.' Opp. to Pls.' Mot. for T.R.O. & Prelim. Inj ("Rugh Decl."), ¶¶ 7–8. Additionally, Dr. Gentry opined that the long-term significance of the recent population decline is indeterminable given the small sample size and other statistical indicators regarding dynamic equilibrium and carrying capacity. *See* Gentry Decl., ¶ 2. As the responsibility of the Court is not to resolve conflicting expert testimony but rather to determine whether the conclusions in the Stein EA are reasonable and well-informed, the testimony of Drs. Rugh and Gentry preclude a finding of arbitrariness or capriciousness on this issue. *See Franklin,* 14 F.3d at 1336; *Jantzen,* 760 F.2d at 986.

Plaintiffs also object to the Stein EA's lack of discussion of the causes of the recent population decline. In particular, Plaintiffs argue that the Stein EA excludes consideration of links between this population decline and food shortages or other climatic events and the likelihood of further ecological occurrences affecting the gray whale population. The Stein EA's failure to analyze these concerns, according to Plaintiffs, constitutes a fatal defect. *See* Pls.' Memo at p. 9. Plaintiffs accurately indicate that the Stein EA lacks a comprehensive discussion of the potential causes of the recent gray whale population decline. That, however, is not the purpose of the Stein EA. An EA is required to "briefly provide sufficient evidence and analysis . . . ." 40 C.F.R. § 1508.9(a)(1) (1997). The Stein EA was not intended to serve as a treatise on marine mammal population dynamics. As the aim of the Stein EA is to address the environmental effects of sonar use, its treatment of the current gray whale population was adequate.

### 4. Effects on Other Species

■ Plaintiffs' fourth claim concerns the supposed failure of the Stein EA to discuss the impact on species other than the California gray whale. Plaintiffs focus on the limited discussion of harbor porpoises contained within the Stein EA. At trial, Mr. Bain testified that the research project could scare away harbor porpoises from the insonified area, thereby reducing the available space in which the porpoises live. That in turn would result in an overcrowding effect where a greater number of porpoises would depend on a presumably static food supply within a given area. Mr. Bain estimated that this chain reaction could ultimately adversely affect—even kill—a significant percentage of the harbor porpoises in the vicinity. *See* Supp. Decl. of David Bain ("Bain Decl."), ¶¶ 2–10; 13–21; 28–41.

In response, Dr. Gentry testified that the scenario described by Mr. Bain was implausible based on the ease with which

harbor porpoises habituate to high-frequency sounds. According to Dr. Gentry, it is therefore doubtful that the sonar would scare any porpoises away from the insonified area. Furthermore, Defendants introduced Dr. Adam Frankel, the scientist supervising observation for Dr. Stein's research project. Dr. Frankel testified that in his experience as an observer for this project as well as Dr. Tyack's project in 2003, zero harbor porpoises had been observed near the insonified area regardless of whether the sonar was active or not. In Dr. Frankel's opinion, harbor porpoises seemingly do not live in or travel through the particular part of the ocean where the research is being conducted. In addition to these experts' testimony, the Stein EA discusses the possible presence of harbor porpoises, their ability to hear sounds in the frequency range of the research and the potential behavioral reactions caused by the sonar. *See* Environmental Assessment at pp. 12; 22; 31–34.

Plaintiffs cannot substantiate their assertion that the Stein EA grossly miscalculates the extent to which the research project will affect harbor porpoises. Even if this Court were to disregard the credible evidence offered through Drs. Gentry and Frankel, Plaintiffs have still failed to demonstrate the likelihood of any harmful effects on the harbor porpoise population. Although Plaintiffs boldly state that the research will create "an extraordinary loss of population," the theory that harbor porpoises will perish as an indirect result of the project as the animals, in avoiding the sonar, relocate to a different area that lacks an adequate food supply is highly speculative. *See* Pls.' Supplemental Mem. in Supp. of Mot. for Prelim. Inj. ("Pls.' Supplement"). Furthermore, Mr. Bain even admitted that the noise from the sonar which could conceivably trigger the tragic chain reaction ending in the death of some creatures is similar to other oceanic noise, such as that from a boat's motor.

Thus the potential harm to harbor porpoises from the sonar—again, which seems quite dubious—is no different than that risked whenever boats permissibly venture into these waters. For this reason, Plaintiffs' allegation that Defendants acted arbitrarily or capriciously in not considering the possible harm to harbor porpoises is fallacious.

■ We also note that Plaintiffs' claims regarding the plight of harbor porpoises was conspicuously absent from the administrative process. Following the announcement of Dr. Stein's permit application, various groups including Plaintiffs contested the Stein EA while it was in draft form prior to NMFS issuing the Permit. At no time, however, did Plaintiffs raise the point of harbor porpoises. While we acknowledge that NEPA obligates the agency to consider the various potential environmental impacts of a proposed action, "it is still incumbent upon intervenors who wish to participate to structure their participation so that it is meaningful, so that it alerts the agency to the intervenors' position and contentions." *Vermont Yankee*, 435 U.S. at 553, 98 S.Ct. 1197. Therefore, that Plaintiffs raised the issue of harbor porpoises for the first time at the T.R.O. hearing detracts from the efficacy of this claim. *See id.*

■ Aside from harbor porpoises, Plaintiffs claim that the Stein EA does not sufficiently consider the effects of the proposed research on other species, including killer whales. On this point, the Court finds it beneficial to note some of the species that the Stein EA explicitly considers: invertebrates such as mollusks, crustaceans, sponges and jellyfish; fish including anchovy, tuna, swordfish, herring, sardine, mackerel, rockfish, and flatfish; sea turtles; seabirds; blue whales; fin whales; minke whales; right whales; humpback whales; beaked whales; sperm

whales; harbor seals; northern fur seals; California sea lions; and sea otters. We include this lengthy list of species to illustrate the comprehensiveness of the Stein EA. Because the Stein EA is specifically designed to briefly discuss the potential environmental impact, it is always possible to identify some considerations which were not analyzed in depth. However, given the extensive list of species that the Stein EA covers, including specific discussions regarding odontocetes such as killer whales, we find that the Stein EA satisfactorily discusses the impact on animals other than gray whales.

### 5. Mitigation Measures

[17] There is no dispute that the Stein EA considers and adopts mitigation measures intended to "minimize the potential for adverse effects on marine mammals." Environmental Assessment at p. 36. Still, Plaintiffs contend that the mitigation measures included are "woefully inadequate." See Pls.' Memo at p. 20. Specifically, Plaintiffs argue that Defendants' intent to use observers stationed on the research vessel and onshore but not employ aerial observation represent insufficient precautions. The evidence, however, indicates otherwise. Dr. Stephen Leathery, Chief of the Permits Division for NMFS, explained that aerial surveys are unlikely to increase the detection of adverse reactions during sonar transmissions given the altitude and airspeed of most survey craft, and thus onshore and onboard observers definitely suffice. See Decl. of Stephen Leathery, ¶ 6. In addition, Dr. Leathery cites evidence that low-flying aircraft such as those conducting aerial surveys often disturb marine mammals and could therefore tamper with the data that the research aims to collect. See id., ¶ 7.

Plaintiffs also contest the effectiveness of the prescribed ramp-up procedure—in which the researchers initiate the sonar signal at a low power level and progressively increase it. The Stein EA details how ramping up the sonar signal in this manner would allow disturbed animals to flee the immediate area. Furthermore, the sonar is to be deactivated if a marine mammal approaches within one hundred meters of the vessel or if any endangered species comes within two kilometers of the vessel. Also, the sonar will only be used during daylight hours so that the onshore and onboard observers can be most effective. NEPA only requires a "reasonably complete discussion of possible mitigation measures."[5] Thus, in light of the absence of evidence illustrating that the sonar even harms marine mammals or other species, we hold that the mitigation measures are entirely adequate.

### 6. Significant Unknowns

During the T.R.O. hearing, Plaintiffs raised the issue of significant unknowns, a claim that they did not include in their original complaint. Plaintiffs' argument on this issue is essentially a conglomeration of elements from their other claims in that they contend the Stein EA did not assess the impact of numerous unknown factors related to the proposal, thereby rendering the NMFS decision to issue the Permit arbitrary and capricious. According to Plaintiffs, the ability of marine mammals to hear the sonar, the effects of sonar on cow-calf communication, the causes of the gray whale population decline, and the potential impact on harbor porpoises all represent significant unknowns that invalidate the legitimacy of the Permit.

---

**5.** This requirement pertains to an EIS rather than an EA. Therefore, given that the former is inherently more analytical and thorough than the latter, there is no question that an EA which satisfies this standard for mitigation measures complies with NEPA.

Throughout its discussion of particular areas of potential environmental impact, the Stein EA acknowledges that there are unknown factors and indeterminable consequences. Plaintiffs seek to use this acknowledgment to justify nullification of the Permit. NEPA, however, requires an agency to discuss the present knowledge base and draw reasonable conclusions given the available scholarship. *See Okanogan Highlands*, 236 F.3d at 473. To demand that an agency predict or even precisely identify every possible unknown prior to approving proposals would severely restrict scientific research. As it was once said, "to solve a problem that we have never solved before, we must leave the door to the unknown ajar."[6] For this reason and in light of the extensiveness of the Stein EA and its attempts to identify the significant unknowns associated with the proposal, the Court refuses to hold that Defendants' failure to hazard a guess as to what unforeseen consequences will stem from unknown variables amounts to a violation of applicable law.

### 7. Bad Faith

Plaintiffs accuse NMFS of conducting the administrative process in bad faith. Plaintiffs argue that because NMFS was biased from the beginning of the entire administrative process surrounding Dr. Stein's permit application, the agency was not objective in preparing the Stein EA, deciding not to conduct an EIS or ultimately issuing the Permit. Allegedly, the agency's response to the 2003 Order reflects its bias in favor of the deployment of the high-frequency sonar. *See* Pls.' Memo at p. 22–24. On the official website of the National Oceanic and Atmospheric Administration ("NOAA"), NMFS posted a listing entitled "Whale Conservation Setback" in which it decried the 2003 Order and proclaimed the absence of scientific

evidence demonstrating any potential harm to marine mammals. *See* Pls.' Ex. 16. The NOAA website posting, in Plaintiffs' opinion, demonstrates NMFS' partiality in support of the proposal. According to Plaintiffs, NMFS's lack of objectivity violates the APA.

While NMFS undoubtedly disagreed with the 2003 Order, such disagreement does not translate into a procedural violation. It is self-evident that an agency which decides to support a given proposal after objectively weighing the merits of that proposal will subsequently defend the propriety of its decision. That NMFS stood by its choice to issue the Permit following the 2003 Order does not create an inference of bias that bears on the objectivity with which the agency initially considered the proposal. Thus, NMFS's support of this type of whale-finding sonar research does not render its decision to grant the Permit arbitrary or capricious. In scrutinizing the tedious EA, we find no basis for any assertion that Defendants deliberately ignored evidence, manipulated the administrative process or engaged in otherwise objectionable behavior. Accordingly, Plaintiffs' allegation of bad faith is untenable.

### 8. Environmental Impact Statement

Plaintiffs' eighth and final objection to the Stein EA concerns NMFS's conclusion that the proposed research did not warrant preparation of an Environmental Impact Statement. NEPA stipulates that an EIS is necessary where an EA demonstrates that a proposed project may have a significant effect on the environment. *Public Citizen v. Department of Transp.*, 316 F.3d at 1021. As the Ninth Circuit explained, "The plaintiff need not show that significant effects *will in fact occur*, but if the plaintiff raises substantial

---

**6.** Richard Feynman, winner of the 1965 Nobel Prize in Physics.

questions whether a project may have a significant effect, an EIS *must* be prepared." *Greenpeace,* 14 F.3d at 1332. An agency's decision not to prepare an EIS is reviewed under the arbitrary and capricious standard. *Marsh,* 490 U.S. at 376–77, 109 S.Ct. 1851; *Anderson v. Evans,* 350 F.3d at 829.

Plaintiffs essentially repeat their first six claims to illustrate that the proposal required an EIS, arguing that the potential harms to marine mammals from the sonar and the unknown consequences associated with the sonar research necessitated further investigation prior to issuance of the Permit. We respectfully disagree. NMFS considered the significance of the potential effects of the research in terms of both context and intensity and concluded that there were not substantial questions of significant impact. *See* Environmental Assessment at pp. 41–43; 40 C.F.R 1508.27 (defining "significantly" for purposes of NEPA). The Stein EA explored all of the questions raised by Plaintiffs—the possible harm to marine mammals from hearing the sonar, the status of the gray whale population, the effects on gray whale calf migration, impact on other species including the harbor porpoise and the adequacy of the mitigation measures included—and reasonably concluded that preparation of an EIS was unnecessary. Thus there is no basis to hold that Defendants acted arbitrarily or capriciously in concluding that the Stein EA foreclosed any substantial questions about significant environmental effects that may occur as a result of the proposed research.

### B.  Compliance with The MMPA

■ The MMPA authorizes the issuance of permits for "takings" of marine mammals for scientific purposes, provided that the Marine Mammal Commission (the "MMC") and the Committee of Scientific Advisors on Marine Mammals (the "CSAMM") first review the proposed tak-

ing. 16 U.S.C. § 1371(a)(1). The MMC, in consulting with the CSAMM, supported NMFS's decision to issue the Permit, finding that Dr. Stein's proposal is "important and will contribute to our knowledge concerning the efficacy of whale finding sonar and its effects on marine mammals" and "consistent with the purposes and policies of the MMPA." Letter from MMC to Stephen Leathery, AR, Tab 5. As Dr. Stein's permit application addresses the various MMPA elements required under 16 U.S.C. § 1374(d)(3) and in light of the support from the MMC and the CSAMM, we find that Defendants have not violated MMPA.

### V.  CONCLUSION

Plaintiffs have failed to establish that Defendants acted in any arbitrary or capricious manner that would constitute a violation of federal law. Given the applicable standard, the fact that Plaintiffs' offer of evidence—only some of which qualifies as expert testimony and is persuasive—partly contradicts some of the conclusions formulated in the Stein EA is insufficient to justify an injunction. The APA, the MMPA and NEPA mandate procedure. NMFS was required to take a hard look at the potential environmental impact and use its own judgment in assessing the merits of the proposal. Defendants heeded the environmental concerns that Plaintiffs had previously voiced and spent considerable time and effort researching and examining the consequences of the proposed research. The Stein EA, produced at the direction of the Court and in response to Plaintiffs' objections, is both specific and exhaustive and thoroughly addresses the environmental impact of the project, including the likely physical and behavioral effects of sonar use on a menagerie of ocean organisms, particularly the gray whale. After adequately identifying and evaluating Dr. Stein's project, NMFS had the discretion to decide whether the

benefits from the research outweighed its environmental costs. *See Robertson*, 490 U.S. at 350, 109 S.Ct. 1835. The decision to issue the Permit was neither arbitrary nor capricious but rather connotes an informed judgment. Accordingly, Plaintiffs' motion for a permanent injunction is HEREBY DENIED and JUDGMENT IS ENTERED IN FAVOR OF DEFENDANTS.

**IT IS SO ORDERED.**